641 A.2d 1265

**Paul F. and Madeline R. KERRIGAN, Petitioners,**

v.

**DEPARTMENT OF ENVIRONMENTAL RESOURCES, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Dec. 16, 1993.

Decided April 22, 1994.

Reargument Denied June 29, 1994.

566

Robert N. Gawlas, Jr., for petitioners.

Barbara L. Smith, for respondent.

Before COLINS and FRIEDMAN, JJ., and DELLA PORTA, Senior Judge.

DELLA PORTA, Senior Judge.

Paul F. and Madeline R. Kerrigan (the Kerrigans) petition for review of the April 8, 1993 order of the Environmental Hearing Board (Board) which dismissed their appeal from an order of the Department of Environmental Resources (DER) directing the Kerrigans and their tenants to cease the operation of a storage battery recovery facility and to remediate the lead contamination on the property.

By deed dated June 22, 1970, the Kerrigans received title to five tracts of land in Butler Township, Schuylkill County. Tract No. 3 (consisting of 13.2 acres) and Tract No. 5 (consisting of 23.4 acres) are bounded on the west by the right-of-way of the Reading Railroad Company and on the east by Mahanoy Creek. These two tracts are divided by Germanville Road. Germanville Road lies to the south of Tract No. 3 and to the north of Tract No. 5.

From 1970 to 1974, Paul Kerrigan, under the name Ashland Metal Company, conducted a scrap metal processing and recovery business on Tracts No. 3 and 5. In 1977, the Kerrigans leased Tract No. 5 to Giordano Waste Material Company (Giordano). On September 1, 1979, the Kerrigans entered into two agreements with Giordano. The first agreement, pertaining to Tract No. 3, was called Agreement of Lease and provided for an initial term of five years, automatically renewable for three successive five-year terms unless terminated by the tenant at the end of a term. At the end of the 20–year period, the title would be conveyed to Giordano for the payment of $1.00. The second agreement, pertaining to Tract No. 5 was entitled Agreement of Sale.

Giordano conducted storage battery recovery operations on Tracts Nos. 3 and 5 under the name Ashland Metal Company. On October 16, 1986, Giordano entered into an agreement with Herbert Eisenstadter which provided, *inter alia,* for the lease of and the eventual sale of Tract No. 3 to Eisenstadter and the assignment to Eisenstadter of the name Ashland Metal Com-

pany. On the same day, Eisenstadter assigned the agreement with Giordano to Broad Mountain Metals, Incorporated (Broad Mountain). The Kerrigans approved of the assignment to Broad Mountain. Broad Mountain conducted a storage battery recovery operation on Tract No. 3 under the name Ashland Metal Company.

The northern part of Tract No. 3 contains a terrace that is about 30 feet higher than the southern part. It extends from Mahanoy Creek on the east, where it is about 8 feet high, to the railroad right-of-way on the west, where it is 15–20 feet high. An office, scale house and storage building were located on the southern part of the Tract. All other facilities associated with the storage battery recovery operation were located on the terrace several hundred feet to the north.

In August, 1987, John J. Leskosky, an environmental protection compliance specialist from DER visited Tract No. 3 for the purpose of reviewing Broad Mountain's activities. He concluded that the operation qualified as a recycling facility and needed no permits. In March, 1988, Leskosky observed a pile of waste material on the terrace and was uncertain whether it constituted hazardous waste or residual waste. Broad Mountain officials informed him that the material had come from Giordano's operations on Tract No. 5 and was to be recycled. Based on this representation, Leskosky did not issue a notice of violation or order for removal of the material.

On September 18, 1989, in response to complaints of the unlawful disposing of battery casings, Gerald F. Olenick, a solid waste specialist from DER, visited Tract No. 3. Olenick took soil samples at four locations on Tract No. 3. Three of the locations were on the western boundary of the site near the railroad right-of-way at the base of the terrace. The fourth was about 50 feet east of the bank of the Mahanoy Creek, below the terrace, in a drainage area leading to the Creek.

The samples were sent to DER's Erie Soil Testing Labora-

tory where they were subjected to the EP toxicity test [1] and the total lead test.[2] Three of the four samples exceeded the level of EP toxicity for lead which DER considers to be hazardous. All of the samples exceeded the measurement of total lead which DER considers to be hazardous in residential areas.

Olenick took additional soil samples from Tract No. 3 on March 29, 1990. All five samples exceeded the level considered hazardous for EP toxicity and for total lead. On April 9, 1990, pursuant to the authority granted to it by the Solid Waste Management Act,[3] The Clean Streams Law,[4] the Hazardous Sites Cleanup Act[5] and the Administrative Code of 1929,[6] DER issued an order directing the Kerrigans, Giordano and Broad Mountain to cease the storage and/or disposal of all solid and hazardous wastes on the property and to propose and carry out a comprehensive program of remediation.

On May 9, 1990, the Kerrigans appealed DER's order to the Board.[7] Hearings were held on June 16 and 17, 1992, before Administrative Law Judge Robert D. Myers. On April 8, 1993, the Board issued an order dismissing the Kerrigans' appeal. The Board concluded that the lead contamination on Tract No. 3 poses a danger of pollution to the waters of the

1. The EP toxicity test measures the potential for the waste material to leach certain toxic heavy metals. DER considers measurements of EP toxicity for lead to be hazardous if they exceed 5.0 milligrams per liter.

2. The total lead test measures the amount of lead potentially emissible into the environment. DER considers measurements of total lead to be hazardous if they exceed 500 milligrams per kilogram in residential areas and 1000 milligrams per kilograms in industrial areas.

3. Act of July 7, 1980, P.L. 380, *as amended,* 35 P.S. §§ 6018.101–6018.1003.

4. Act of June 22, 1937, P.L. 1987, *as amended,* 35 P.S. §§ 691.1–691.1001.

5. Act of October 18, 1988, P.L. 756, 35 P.S. §§ 6020.102–6020.1304.

6. Act of April 9, 1929, P.L. 177, *as amended,* 71 P.S. §§ 51–732. The powers and duties of DER, its officers and departmental and advisory boards and commissions are found in Sections 1901–A through 1930–A of the Administrative Code, 71 P.S. §§ 510–1 through 510–30 and 71 P.S. §§ 510–101 through 510–108.

7. Broad Mountain filed a notice of appeal which was later withdrawn; Giordano did not appeal.

Commonwealth and that because the Kerrigans are landowners of Tract No. 3 within the meaning of Section 316 of the Clean Streams Law,[8] they can be required to comply with DER's April 9, 1990 order whether or not they had any responsibility for creating the condition.[9]

On appeal to this Court, the Kerrigans argue (1) the determination that the lead contamination posed a danger of pollution to the waters of the Commonwealth is not supported by substantial evidence and competent expert testimony, and (2) they are not the owners of the site within the meaning of the Clean Streams Law.

■■■ Our scope of review of a Board decision is limited to a determination of whether an error of law has been committed, whether constitutional rights have been violated, or whether any necessary findings of fact are not supported by substantial evidence. *Newlin Corp. v. Department of Environmental Resources*, 134 Pa.Commonwealth Ct. 396, 579 A.2d 996 (1990), *petition for allowance of appeal denied*, 527 Pa. 595, 588 A.2d 915 (1991). Substantial evidence has been defined as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *A.H. Grove & Sons, Inc. v. Department of Environmental Resources*, 70 Pa.Commonwealth Ct. 34, 452 A.2d 586 (1982).

■■■ We first consider whether there is substantial evidence that the lead contamination on the site presents a danger of

8. 35 P.S. § 691.316. Section 316 was added to the Clean Streams Law by Section 5 of the Act of August 23, 1965, P.L. 372. Section 316 provides:

   Whenever the department finds that pollution or a danger of pollution is resulting from a condition which exists on land in the Commonwealth the department may order the landowner or occupier to correct the condition in a manner satisfactory to the department or it may order such owner or occupier to allow a mine operator or other person or agency of the Commonwealth access to the land to take such action. For purpose of this section, 'landowner' includes any person holding title to or having a proprietary interest in either surface or subsurface rights.

9. Because the Board sustained DER's order under the Clean Streams Law, it did not consider the applicability of the other statutes cited in the order.

pollution to the waters of the Commonwealth. Among the witnesses presented at the hearings by DER was Patricia J. Peck, a soil scientist for DER's Bureau of Waste Management. Peck testified that she visited Tract No. 3 on July 11, 1991 and visually examined the site. Because the soil on the site looked very homogeneous, Peck randomly chose three locations from which to take soil samples. The first location was on the terrace approximately 100 feet from Germanville Road. The second location was on the terrace behind the waste stockpile. This location was approximately 100–150 feet from the railroad tracks. The third location was approximately 100 feet from the battery operations building. Peck took two samples from each location, digging to a depth ranging from 6 to 12 inches.

One set of samples was forwarded to DER's Erie Laboratory for particle size analysis; the other set was sent to the Merkle Laboratory to determine pH levels [10] and the cation exchange capacity.[11] Based on the results of these tests, Peck concluded that the soil had a great potential to leach metals.

On cross-examination, Peck testified that she did not have any knowledge as to whether the soil texture changed at a depth greater than 12 inches. Peck further testified that she did not take any samples from the lower terrace; [12] did not drill down into the lower terrace to see whether the texture of the soil changed at a greater depth; did not take any samples by the creek; and, did not drill in the area by the creek.

DER also presented the testimony of Alexander J. Zdzinski, a hydrogeologist in its permitting section. Zdzinski also visit-

10. pH measures the acidity of the soil. The lower the pH, the easier metals are leached through the soil.

11. Cation exchange capacity (CEC) analysis measures the negative sites on a soil particle available for metal adsorption. The lower the CEC value, the greater the tendency for leaching metals.

12. The terrain apparently rises from the creek approximately eight feet to a relatively flat area that has been referred to as the lower terrace. The terrain then rises again to what is called the terrace or the upper terrace. The buildings that housed the battery recovery operations are located in this area. The elevation of the terrace has been estimated to be between 30 to 35 feet.

ed Tract No. 3 on July 11, 1991 and visually inspected the site. He found three seeps on the southern edge of the property. He testified that he could not determine whether these seeps are the result of a high regional water table or whether there are perched zones of water [13] at that portion of the site. He further testified that he could not be certain, if a perched zone exists, whether the zone extends under the portion of the site where the building housing the battery recovery operations is located.

Zdzinski found no direct evidence of seeps along the creek side of the property. From this observation, Zdzinski concluded that, at least in the area by Mahanoy Creek, it was likely that the water table was close to the level of the creek.

Zdzinski testified as to the presence of mine spoil on the terrace. He testified he did not know the exact thickness of the spoil material; he did not know whether the spoil material continued across the terrace in an even thickness or whether there was some underlying topography; and he did not know the consistency of the material under the spoil material; and he did not know whether the material underlying the site is the same in different parts of the site.

Zdzinski presented two scenarios regarding the water table that he considered to be the most likely. In the first scenario, the spoil pile was of a consistent thickness across the width of the site. Because the spoil material appears to be relatively porous, it would allow water to drain out more rapidly. This would result in a low water table underneath. Assuming that the water table does not go beneath the level of the creek, the maximum depth would be 35 feet.

In the second scenario, there is some underlying topography and the spoil material has been deposited on an uneven surface. In this situation, if the material beneath the spoil is not as permeable as the spoil, the water table might be somewhat higher than in the first scenario. Zdzinski testified that he could not rule out either scenario; that he has not seen

13. Zdzinski explained that a perched zone of water is an area of water which collects above an impermeable zone above the regular water table.

any evidence which would indicate which scenario actually applied; and there are other possible scenarios.

From a review of the testimony presented before the Board, we conclude that there is not substantial evidence to support a finding that the lead contamination on Tract No. 3 posed a danger of pollution to the waters of the Commonwealth. Analysis of the soil indicated that the soil had a great potential to leach metals. However, the soil samples were taken at depths ranging from 6 to 12 inches. No soil samples were taken at a depth greater than 12 inches and there was no testimony presented to establish the composition of the soil below 12 inches.

There was no testimony to establish the location of the groundwater under the terrace. Zdzinski could only establish with certainty the water table in the area surrounding the creek. Under one of the scenarios Zdzinski proposed, the water table could be as much as 35 feet below the surface of the terrace. Under the other scenario, the water table would be higher. However, Zdzinski did not testify as to an exact depth. Further, Zdzinski could not rule out the possibility that a perched zone of water existed under the terrace.

Zdzinski testified that the major factors a hydrogeologist looks at in determining the potential for groundwater contamination are the depth between the source of contamination and the water table, the material that exists, and the nature of the material that exists between the source of contamination and the groundwater. Other factors could be whether there are structures within the material, in the unsaturated zone above the groundwater table or within the aquifer itself.

Here, Zdzinski was unable to determine the depth of the water table, the nature of the material between the lead and the groundwater and whether there were topographical structures under the spoil material. Zdzinski did not have mine maps or maps of prior existing topography; did not have any well or piezometer date for the site; and did not install any kind of device on the site. Zdzinski based his testimony on his visual observations and drew his conclusions from them.

Based on the above discussion, we reverse the order of the Board.[14]

## ORDER

AND NOW, this 22nd day of April, 1994, the order of the Environmental Hearing Board, decision No. 90–188–MR, dated April 8, 1993, is hereby reversed.

14. Because of our holding that there is not substantial evidence to support the Board's finding, we need not reach the second issue raised by the Kerrigans, that they are not "landowners" within the meaning of the Clean Streams Law.