**WESTINGHOUSE ELECTRIC CORPORATION,**
Petitioner

v.

**PENNSYLVANIA DEPARTMENT OF ENVIRONMENTAL PROTECTION,**
Respondent.

Commonwealth Court of Pennsylvania.

Argued June 2, 1997.
Decided Jan. 2, 1998.
Reargument Denied March 9, 1998.

David J. Armstrong, Pittsburgh, for petitioner.

Dennis A. Whitaker, Harrisburg, for respondent.

Before SMITH and FRIEDMAN, JJ., and NARICK, Senior Judge.

SMITH, Judge.

Westinghouse Electric Corporation (Westinghouse) petitions for review of the November 5, 1996 adjudication and order of the Environmental Hearing Board (Board) determining that Westinghouse violated provisions of The Clean Streams Law, Act of June 22, 1937, P.L. 1987, *as amended*, 35 P.S. §§ 691.1—691.1001, and related regulations and assessing a civil penalty of $5,451,283. The Department of Environmental Resources, now the Department of Environmental Protection (DEP), filed its complaint for assessment of civil penalties against Westinghouse on August 16, 1988. Westinghouse questions whether the Board properly applied the statute of limitations, whether the Board's determination that Westinghouse's facility caused groundwater contamination is supported by substantial evidence and whether the Board properly assessed the civil penalty.

## I.

### A.

In 1968 Westinghouse constructed an elevator manufacturing plant near Gettysburg and solely operated the plant from 1969 until it was sold in 1989. During construction, an old farm pond where the central portion of the eastern side of the plant is now located was drained; trash, old cars, auto parts, scrap metal and the like were removed from the pond, and it was later filled in.

Until at least 1984 Westinghouse used the degreasers trichloroethylene (Tri) and/or 1,1,1–trichloroethane (Ta) in various operations and released them into the soil and water in several ways. Exposure to Tri and Ta can cause toxic effects including cardiac arrhythmia and liver and kidney damage. Component parts of elevators went through a vapor degreasing machine to remove protective oil coatings before entering the paint booth. Grates lining the bottom of the booth were cleaned at the plant several times a year until 1984 by submersion overnight in paint stripper, with lighter ones then steam cleaned on a concrete pad by the pumphouse, near the southwest corner of the plant. The liquid produced sometimes ran off into the grass or escaped down a drain leading to a storm sewer that emptied into a small stream. Tri and Ta were not used in the steam-cleaning process.

Metal turnings were produced in the manufacturing area of the plant and were collected and placed in small hoppers; those were then emptied into large hoppers in the railroad dock at the northwest corner of the plant. Workers regularly dumped spent degreaser into the small hoppers. The large hoppers had holes punched in the bottom to permit the liquid to drain out. It then flowed down the sloping concrete floor of the dock to the outside and seeped into the soil. The soil outside the railroad dock area developed dark stains, and analysis of samples from that area showed high concentrations of Tri and Ta. DEP's expert hydrogeologist, Jeffrey Molnar, testified that release of degreaser into the soil at this point would result in groundwater contamination and that the pattern of groundwater contamination indicated at least two separate releases.

Between 1971 and 1978 drums of spent degreaser were stored on pavement outside the south wall of the plant. In that period some drums leaked once or twice a week, and the liquid ran off the pavement and into the adjacent soil. The soil became discolored, and testing showed the presence of 40 parts per billion (ppb) Tri. In the early 1970s, when drums of degreaser were unloaded from trucks, they sometimes were dropped and then leaked. In 1981 the plant began receiv-

ing Ta supplies to a large storage tank in the courtyard area. The pumping processes, along with leaks in the valves and hoses, resulted in the leakage of Ta detected in at least one courtyard soil sample. Degreasers were also used in welding; employees in the welding area occasionally poured spent degreaser into holes in the floor joints or on the grass outside.

DEP collected a water sample from near the discharge point for the pumphouse storm sewer on August 16, 1983. The sample contained two ppb Tri and four ppb Ta. Testing of residential wells nearby, including 66 to the southeast, 34 to the east and 13 to the north, detected the presence of Tri, Ta and other contaminants in more than 60 of them. Without remediation, Tri or Ta in groundwater can persist for thousands of years; with active remediation, restoring the aquifer will take at least twenty years.

DEP alleged violations of The Clean Streams Law. Section 301, 35 P.S. § 691.301, provides: "No person ... shall place or permit to be placed, or discharged or permit to flow, or continue to discharge or permit to flow, into any of the waters of the Commonwealth any industrial wastes...." Section 307(a), 35 P.S. § 691.307(a), prohibits discharge of "industrial wastes in any manner, directly or indirectly," into such waters. Section 401, 35 P.S. § 691.401, provides that it is unlawful to place or to permit to be discharged into waters "any substance ... resulting in pollution...."

DEP also alleged violations of certain regulations implementing the statutory provisions. 25 Pa.Code § 101.2(a) provides:

If, because of an accident or other activity or incident, a toxic or taste and odor-producing substance or another substance, which would endanger downstream users of the waters of this Commonwealth, would otherwise result in pollution or create a danger of pollution of the waters, or would damage property, is discharged into these waters—including sewers, drains, ditches or other channels of conveyance into the waters—or is so placed that it might discharge, flow, be washed or fall into them, it shall be the responsibility of the person or municipality at the time in charge of the substance or owning or in possession of the premises, facility, vehicle or vessel from or

on which the substance is discharged or placed to forthwith notify the Department by telephone of the location and nature of the danger and, if reasonably possible to do so, to notify known downstream users of the waters.

Furthermore, 25 Pa.Code § 101.2(b) requires that, in addition to the notices set forth in Section 101.2(a), "the person ... shall immediately take ... necessary steps to prevent injury to property and downstream users of the waters" and shall remove the residual substances from the ground and the affected waters within 15 days, to the extent required by DEP. Lastly, 25 Pa.Code § 101.3(a) provides: "Persons ... engaged in an activity which includes the ... use, application or disposal of polluting substances shall take necessary measures to prevent the substances from directly or indirectly reaching waters of the Commonwealth, through accident, carelessness, maliciousness, hazards of weather or from another cause."

## B.

Westinghouse raised the defense of the bar of the statute of limitations to all of the alleged violations. Section 605(c) of The Clean Streams Law, 35 P.S. § 691.605(c), provides that "there shall be a statute of limitations of five years upon actions brought by the Commonwealth pursuant to this section." Because DEP's action was filed August 16, 1988, the Board determined that the causes of action must have accrued after August 16, 1983, unless an exception applied.

DEP argued that the "discovery rule" exception applied, i.e., that the period for filing the claim was tolled until DEP knew or reasonably should have known of the injuries. Citing *In re Huffman's Estate*, 349 Pa. 59, 36 A.2d 640 (1944), the Board stated that Westinghouse, as the party asserting the affirmative defense of the statute of limitations, bore the initial burden of establishing that the action was filed after the applicable period would have expired, had it started to run at the time the cause of action accrued. If Westinghouse met that criterion, then the burden would shift to DEP to justify the delay. The Board then considered when each cause of action accrued.

For alleged violations of Sections 301, 307 and 401 of The Clean Streams Law, the Board concluded that a cause of action does not accrue until waste or substances causing pollution actually enter the waters of the Commonwealth, not when they are first released into the environment. With regard to 25 Pa.Code § 101.3(a), the Board rejected DEP's interpretation that failure to design a facility adequately or to educate workers may give rise to a cause of action, reasoning that unlimited possible preventive measures could lead to unlimited liability. It again set entry into waters as the triggering event. As for 25 Pa.Code § 101.2(a) and (b), however, the Board concluded that the prohibition against placing harmful substances where they "might discharge" into waters encompassed any initial release into the ground. The Board determined that these provisions created continuous duties to notify DEP and downstream users and to take necessary steps to prevent injury. Therefore, the ongoing failures to comply were continuing violations, and the limitations period began to run on the last day of the violations.

In addition, the Board concluded that the discovery rule applies to the violations asserted here. It referred to federal decisions interpreting 28 U.S.C. § 2462, which is applicable to actions for civil fines and penalties generally, as including the discovery rule in cases involving federal water quality statutes, e.g., *United States v. Windward Properties, Inc.*, 821 F.Supp. 690 (N.D.Ga.1993). More directly, the Board noted the difficulty of detecting groundwater contamination and the application of the discovery rule to subsurface injury in other contexts. In *Smith v. Bell Telephone Co. of Pennsylvania*, 397 Pa. 134, 153 A.2d 477 (1959), the Supreme Court held that for tort causes of action arising from subsurface injury, such as to a sewer line, the statute of limitations runs from the time of the discovery of the harm or when it reasonably should have been discovered.

As for the number of Clean Streams Law violations, the Board found that the presence of Tri and Ta in the water of the little stream showed contamination by Westinghouse; however, without proof of specific instances when water from the cleaning of grates escaped, the Board could find only one violation each of Sections 301, 307 and 401. Based on

testimony that degreasers did enter groundwater in the area of the railroad dock and that the pattern of contamination indicated at least two releases, the Board concluded that DEP had met its burden of proving two releases into groundwater. In the absence of such specific proof relating to the alleged leaking from the storage drums and dumping of spent Tri from a 275–gallon tank, DEP had not met its burden of showing that those releases entered groundwater. The same reasoning was applied to alleged violations of 25 Pa.Code § 101.3(a).

For violations of 25 Pa.Code § 101.2(a), the Board determined that DEP had proven releases from the railroad dock without notice or corrective action several times a week from 1973 to 1978. For leakage from the drums in the storage area, DEP had proven discharges of at least once a week between 1971 and 1978. Based on evidence of Ta in at least one soil sample from the courtyard, the Board found one violation relating to delivery from trucks to the storage tank. For dumping of small containers by employees in the welding area, because the number was not clear, the Board credited DEP with having proven one violation; the Board accepted DEP's evidence regarding the dumping of roughly 50 gallons from the 275–gallon storage tank. For leakage from drums of degreaser dropped during delivery, the Board concluded that DEP had not proven that any such events occurred after the July 31, 1970 effective date of the civil penalty provisions in Section 605 of The Clean Streams Law. Further, the Board held that when duties arise under 25 Pa.Code § 101.2(a), they also arise under Section 101.2(b). Westinghouse did not undertake corrective measures before DEP's investigation began; therefore, the same number of violations were proven.

In determining the appropriate penalties, the Board first referred to the preponderance of the evidence standard of proof in its proceedings and stated that, once DEP showed contamination of waters by Westinghouse, the burden shifted to Westinghouse to show that all or some of the contamination came from other sources. The Board rejected Westinghouse's assertion that the source

of the problem was contamination present in the old farm pond before construction. Although there was evidence that the pond contained junk, and one witness changed his testimony to state that he saw steel drums there as well, the Board noted that Westinghouse offered no proof of the presence of Tri or Ta before the plant was built. It accepted the testimony of Molnar that Tri and Ta could migrate from the pumphouse to the pond but not the other way.

The Board rejected Westinghouse's contention that 13 other commercial establishments in the area might be the source, noting that its witness agreed that all but two were outside the area potentially affected by contamination, that those two were down gradient, and that, apart from a container of mineral spirits labeled 5 percent Tri at an auto body shop, there was no evidence that any of the establishments used Tri or Ta or evidence of dumping into the soil, much less of entry into groundwater. Similarly, Westinghouse did not prove its assertions that septic tank cleaning products could be the source; it presented no evidence that such products contain Ta or that any homeowners used any products containing Tri.

Concerning the direction of the flow of contamination, the Board accepted Molnar's testimony that the direction had changed from east and southeast to east and northeast after residents to the southeast stopped drawing water from their wells, which was in agreement with early reports prepared for Westinghouse. Therefore, the Board concluded that Westinghouse was responsible for the contamination and that it had failed to show that any other source was responsible in whole or in part.

█ Under The Clean Streams Law the Board, not DEP, assesses any civil penalty; DEP may make a recommendation. The Board rejected DEP's higher proposed amount and assessed a penalty of $61,500 for violations of Sections 301, 307 and 401 of The Clean Streams Law. The Board worked backward from DEP's requested penalty of $2,677,384 for violations of 25 Pa.Code

§ 101.2(a) and determined that it broke down to $2.60 per day for each release of Tri and $0.13 per day for Ta, which it deemed to be reasonable. Rejecting DEP's calculation of a combined penalty of $5,989,000 for violations of 25 Pa.Code §§ 101.2(b) and 101.3(a), the Board concluded that the same figure as for 25 Pa.Code § 101.2(a) violations was appropriate. It accepted DEP's claim of $35,015 for costs of investigating the violations, for a total civil penalty of $5,451,238.[1]

## II.

Westinghouse first renews its contention that recovery is barred on all of the claimed violations by the five-year period specified in Section 605(c) of the Clean Streams Law. It challenges the Board's interpretation of *In re Huffman's Estate*, pointing out that the case actually states that when an action has been delayed beyond the applicable period, and the statute is pleaded, the burden is on the plaintiff to prove facts to resist its operation. Westinghouse notes that none of DEP's fact witnesses testified to mishandling of industrial wastes any later than 1991 (and that Westinghouse's fact witnesses continued to deny any mishandling at all).

Westinghouse alleges that the Board acted from a motive to cure a fatal flaw in DEP's case when it interpreted Sections 301, 407 and 401 of The Clean Streams Law and 25 Pa.Code § 101.3(a) as requiring actual entry of substances into waters before the cause of action accrues. It disputes the Board's reliance upon *Kerrigan v. Department of Environmental Resources*, 163 Pa.Cmwlth. 565, 641 A.2d 1265, *appeal denied*, 539 Pa. 671, 652 A.2d 841 (1994), where this Court reversed a determination that contamination of soil from storage battery recovery operations posed a danger of pollution of waters, when there was no proof of contamination of waters or of a connection between the soils and a water table possibly 35 feet below. Here, the Board found that Tri and Ta are very mobile in soil and that groundwater under

1. As DEP emphasizes, and Westinghouse does not acknowledge, this Court's scope of review of a decision of the Board is limited to determining whether the Board's findings of fact are supported by substantial evidence in the record and

whether it committed an error of law or a constitutional violation. *Empire Coal Mining & Dev., Inc. v. Department of Environmental Resources*, 678 A.2d 1218 (Pa.Cmwlth.1996).

the plant was contaminated; therefore, the time of discharge should be the appropriate triggering event.

■ Westinghouse argues that the Board erred in placing the burden on Westinghouse to show that the action is untimely because the Board's approach in effect requires a defendant to confess alleged misdeeds and to prove when they occurred in order to have the protection of the statute of limitations. Westinghouse contends that under the Board's holding DEP may wait for the passage of time to erode the possibility of mounting a defense, make vague allegations and then require the defendant to refute them in exculpatory detail. This is contrary to the purpose of statutes of limitations to protect defendants from claims that are so old that defendants are prejudiced in mounting defenses. *Schmucker v. Naugle*, 426 Pa. 203, 231 A.2d 121 (1967).

Further, Section 602(d) of The Clean Streams Law, 35 P.S. § 691.602(d), relating to criminal penalties, expressly states that each day of continued violation constitutes a separate offense, and the absence of such language in Section 605, relating to civil penalties, precludes the Board from regarding violations as being continuous for purposes of civil penalties. Westinghouse also cites *Harrisburg Bank v. Commonwealth*, 26 Pa. 451 (1856), where the court stated that the repose of a statute of limitation could not be suspended on so unreasonable a condition that a party turn self-accuser and inform on itself.

In regard to the discovery rule, Westinghouse notes that Section 605 does not make reference to discovery, whereas other environmental protection statutes do.[2] In addition, it contends that the federal decisions under the Clean Water Act are undermined by the decision in *3M Co. (Minnesota Mining and Mfg.) v. Browner*, 17 F.3d 1453 (D.C.Cir.1994), which was decided after the submission of post-hearing briefs in this case. There the Court of Appeals held that the five-year statute of limitations in 28 U.S.C. § 2462 on actions for civil fines, penalties or forfeitures begins to run from when the violation occurs, not from when it is discovered. The Court of Appeals decided that Congress did not intend to incorporate a concept of discovery. Westinghouse states that it was placed in the untenable position of being required to show, without access to the relevant information, whether DEP exercised due diligence in making efforts to discover the alleged violations.

■ This Court first agrees with Westinghouse only for shifting purposes that the Board erred in stating that the burden would be upon Westinghouse to show that the causes of action accrued before August 16, 1983. Once a defendant has pleaded the statute of limitations, the burden is upon the plaintiff to bring his or her claim within the statute. *McPhilomy v. Lister*, 341 Pa. 250, 19 A.2d 143 (1941). The Board's error in this regard, however, was harmless.

■ The validity of the vast majority of DEP's claims in this case has always turned upon whether violations of 25 Pa.Code § 101.2(a) and (b) are continuous and whether the discovery rule applies. On the first point, the Court agrees with the Board and DEP. The requirement of these provisions for anyone discharging pollutants to provide notice to DEP and downstream users and to take steps to prevent injury and further pollution of waters cannot reasonably be read as ceasing the day (or the hour) after a discharge takes place. Contrary to Westinghouse's complaints on this point, it is the substantive requirement of the regulation, not overreaching on the part of the Board, that requires the party to turn "self-accuser."[3]

The absence of language in Section 605(c) of The Clean Streams Law defining each day

---

**2.** Section 10.3 of the Air Pollution Control Act, Act of January 8, 1960, P.L. (1959) 2119, *as amended*, added by Section 13 of the Act of July 9, 1992, P.L. 460, 35 P.S. § 4010.3, Section 617 of the Solid Waste Management Act, Act of July 7, 1980, P.L. 380, *as amended*, 35 P.S. § 6018.617, and Section 1314 of the Storage Tank and Spill Prevention Act, Act of July 6, 1989, P.L. 169, *as amended*, 35 P.S. § 6021.1314, all provide that actions may be commenced within specified periods "from the date the offense is discovered."

**3.** Contrary to the representation of Westinghouse, the statute of limitations at issue in *Harrisburg Bank* was that for forfeitures under penal acts, and the action was not viewed by the majority as one for civil penalties.

as a separate offense in no sense requires a conclusion that a violation may not be continuing. Section 605(a), 35 P.S. § 691.605(a), expressly states: "The civil penalty so assessed [by the Board after a hearing] shall not exceed ten thousand dollars ($10,000) *per day* for each violation." (Emphasis added.)[4] From the earliest violations that DEP proved, duties to report and to take corrective action arose. Those duties continued, and later violations created new duties, which also continued.

▮ The Court also agrees that the discovery rule applies. As DEP notes, if a provision such as Section 605(c) neither expressly nor implicitly prohibits application of the discovery rule, the courts are free to employ it. *Levenson v. Souser*, 384 Pa. Superior Ct. 132, 557 A.2d 1081, *appeal denied*, 524 Pa. 621, 571 A.2d 383 (1989). The Board's analogy to the use and necessity of the discovery rule for subsurface injury to property of tort plaintiffs is particularly apt. *See Smith.* The Board found that DEP's 1981, 1982 and 1983 inspections were brief and routine and were not directed toward checking the plant site in detail for evidence of illicit discharges. The Board rejected Westinghouse's assertion that DEP would have found any violations sooner had it exercised reasonable diligence during the inspections. Had Westinghouse complied with its duty under 25 Pa.Code § 101.2(a) to report discharges of toxic substances, matters would be different.

### III.

▮ Next Westinghouse questions whether the Board's determination that the plant's operations caused groundwater contamination is supported by substantial evidence. It notes that the Board criticized DEP several times for not offering proof of specific incidents. Westinghouse also asserts that the Board ignored the Remedial Investigation and Feasibility Study (RI/FS) that it

conducted with oversight from the Environmental Protection Agency. The RI/FS, based on sampling from 1989, concluded that groundwater under the plant and the plume of contamination flowed toward the east and northeast. Westinghouse characterizes as "unsupported" Molnar's theory that the flow changed from east and southeast after residents to the southeast stopped pumping from their wells. As the Board noted, however, apart from Molnar's testimony, the preliminary investigation of volatile organic compound contamination prepared by Westinghouse's first consultant identified the flow as being to the east and southeast. Plainly, Westinghouse is asking this Court to reweigh evidence in its favor, which the Court may not do. The Court may determine only whether the Board's necessary findings are supported by substantial evidence and whether it committed an error of law or a constitutional violation. *See* n1 above.

As to whether the contamination came from some other source, Westinghouse first quotes *C & K Coal Co. v. Department of Environmental Resources*, 1992 EHB 1261, which states that evidence and logically deducible inferences must so preponderate in favor of a proposition sought to be established as to exclude any equally well-supported belief in an inconsistent proposition. The Court notes, however, that this statement of the preponderance of the evidence standard of proof that applies before the Board is not the same as this Court's scope of review to determine whether substantial evidence supports findings made by an agency. In *Peak v. Unemployment Compensation Board of Review*, 509 Pa. 267, 501 A.2d 1383 (1985), the Supreme Court held that "substantial evidence" is such evidence as a reasonable mind might accept as adequate to support a finding. Westinghouse prefers its own evidence, but it does not attempt to show that DEP's evidence, if credited, does not rise to the level of substantial evidence.[5]

---

4. Before amendment by Section 1 of the Act of October 7, 1976, P.L. 1099, Section 605 provided: "The civil penalty so assessed shall not exceed ten thousand dollars ($10,000), plus five hundred dollars ($500) for each day of continued violation."

5. Westinghouse complains that aerial photographs showing the developing use of the pond

as a dump and another showing an Agway chemical facility near the plant with trucks and drums "in disarray" were excluded (Westinghouse disregards the Rules of Appellate Procedure by including these excluded materials in its Supplemental Reproduced Record (II)), and it faults the Board for expressly crediting Molnar over Westinghouse's expert Patrick O'Hara based on credentials and experience, when it was agreed at

Westinghouse does attack as "equivocal" Molnar's testimony that chemicals could flow either way from the railroad dock area depending on exactly where they entered the ground, whereas O'Hara testified that discharges in that area would flow away from the pond, in a direction where wells were not affected. The Court's review shows that the testimony was not equivocal. Further, this argument does not address evidence of improper discharges such as that in DEP's Ex. C–131. In Table 2–5, "Summary of Historical On–Site Analytical Data" of Ex. C–131, the highest readings produced for Westinghouse for samples near discharge points were 960 ppb of Tri and 400,000 micrograms per kilogram (an equivalent unit) of Ta, from a sample of soil/sludge taken from the railroad dock on October 28, 1983.[6]

## IV.

Finally, Westinghouse challenges the components of the civil penalty relating to violations of 25 Pa.Code § 101.2(a) and of §§ 101.2(b) and 101.3(a). It recognizes that this Court will not substitute its judgment for that of the Board; so long as the penalties "reasonably fit" the violations, the Court will uphold the Board's determination. *Wilbar Realty, Inc. v. Department of Environmental Resources*, 663 A.2d 857 (Pa.Cmwlth. 1995), *appeal denied*, 544 Pa. 619, 674 A.2d 1079 (1996). Section 605(a) of The Clean Streams Law requires that the Board consider "the wilfulness of the violation, damage or injury to the waters of the Commonwealth or their uses, cost of restoration, and other relevant factors." Westinghouse states that three considerations relate to whether the Board exercised its discretion properly: whether the Board is required to reveal its calculation; whether the Board properly assessed the degree of harm; and whether the Board properly considered the actions of Westinghouse in response to the contamination.

■ Westinghouse argues that the Board denied it the protection of the statute of limitations by stating that Westinghouse had not proven that discharged pollutants entered groundwater before August 16, 1983, but then unfairly based its penalty calculation on multiple incidents of contamination of waters long ago. The first part of this argument has been rejected above; however, the second part touches on a valid point. The Board determined that only two instances of actual entry into groundwater had been proven, yet it based the degree-of-harm portion of its penalty analysis on the assumption that all of the contamination of wells in the area was caused by the illegal discharges at the plant. In the Court's view this was error.

Had the Board found that the hundreds of illegal discharges that took place actually caused contamination of waters in violation of provisions of The Clean Streams Law, then the effect on numerous nearby wells would be part of the measure of injury. Because the Board declined to make such findings, it could not then consider such effects in its calculation of the proper penalty for violations of 25 Pa.Code § 101.2(a). This is not to suggest that the hundreds of proven violations of Section 101.2(a) and (b) for not providing notice and not taking corrective measures are not subject to penalties—they certainly are. However, it will be necessary to remand this matter to the Board for another computation of penalties, one that is not based on the Board's consideration of matters that it found not to be proven.

■ Westinghouse contends that the Board incorrectly rejected various challenges that it made to the methods of collection of water samples, such as claims of the failure of collectors on some occasions to wear gloves; to the methods used to analyze samples, which assertedly were useful for some purposes but not for analyzing drinking wa-

the hearing that O'Hara would present evidence generated by a team of experts. These matters, however, do not address the question of whether substantial evidence exists to support the findings that the Board did make.

6. Westinghouse also asserts that the Board erred in permitting DEP to enlarge upon its case during rebuttal by presenting new evidence of con-

tamination with a chemical known as PCE and further erred by not permitting Westinghouse to present surrebuttal. The Court does not deem the question of this procedural ruling to be set forth in or suggested by Westinghouse's statement that the Board's findings were not supported by substantial evidence. Hence, it is waived. Pa. R.A.P. 2116(a).

ter; and to the evaluation of the degree of danger posed, which assertedly disregarded DEP's own published requirements of minimum detection level and overstated the increased risk of cancer. This Court must show deference to the findings of agencies because of their specialized technical knowledge, and where the findings are supported by substantial evidence the Court will not disturb them. *Al Hamilton Contracting Co. v. Department of Environmental Protection*, 680 A.2d 1209 (Pa.Cmwlth.1996).

■ Westinghouse argues that the Board improperly rejected as irrelevant consideration of extensive remedial actions that Westinghouse took after DEP's investigation began. The Board did not consider the costs of remediation in its penalty assessment; therefore it did not deduct those costs from the penalty.[7] The Court notes that 25 Pa. Code § 101.2(e) provides: "Compliance with this section may not affect the civil or criminal liability to which the person ... may be subject as a result of an activity or incident under The Clean Streams Law ... or regulation." The Board may not reduce civil liability based on compliance with the notice and corrective measures requirements of Section 101.2; it is not required to grant a reduction based on remedial measures taken after the fact. For the reasons stated, this matter shall be remanded for a calculation of the appropriate civil penalty to be imposed. Because the Court concludes that the Board properly applied the statute of limitations and that it made findings of fact supported by substantial evidence in the record, the Board's order is affirmed in all other respects.

### ORDER

AND NOW, this 2nd day of January, 1998, the order of the Environmental Hearing Board is vacated to the extent of the calculation of the civil penalty and is remanded for a calculation of the appropriate penalty to be

imposed. In all other respects the order is affirmed.

Jurisdiction relinquished.

---

7. Westinghouse asserts that the Board imposed the largest penalty ever assessed for violations of The Clean Streams Law despite Westinghouse's prompt and expensive actions to protect its neighbors once it learned of the problem.