The PINES AT WEST PENN, LLC, Petitioner

v.

PENNSYLVANIA DEPARTMENT OF ENVIRONMENTAL PROTECTION, Respondent.

Commonwealth Court of Pennsylvania.

Submitted on Briefs Oct. 29, 2010.

Decided March 18, 2011.

Publication Ordered June 6, 2011.

Daniel F. Schranghamer, Williamsport, for petitioner.

Joseph S. Cigan, III, Assistant Counsel, Wilkes–Barre, for respondent.

BEFORE: McGINLEY, Judge, and McCULLOUGH, Judge, and KELLEY, Senior Judge.

OPINION BY Judge McCULLOUGH.

The Pines at West Penn, LLC (Petitioner) petitions for review of the May 14, 2010, order of the Environmental Hearing Board (Board), upholding a civil penalty in the amount of $11,589.00 imposed by the Department of Environmental Protection (DEP) for repeated violations of the effluent limitations of Petitioner's National Pollutant Discharge Elimination System (NPDES) permit.[1]

1. DEP originally assessed Petitioner with a     civil penalty in the amount of $11,689.00.

Petitioner operates a mobile home park in New Ringgold, Pennsylvania, consisting of approximately 200 homes and an on-site sewage treatment plant. (Findings of Fact Nos. 2–4.) Petitioner received a NPDES permit from DEP in July 2005 permitting the discharge of treated sewage from the sewage treatment plant into an unnamed tributary to Lizard Creek. (Findings of Fact Nos. 5–6.) This permit required Petitioner to submit a monthly discharge monitoring report (DMR) and set forth certain effluent limitations with respect to the discharge of suspended solids, nitrogen, fecal coliforms, and ammonia. (Findings of Fact Nos. 5–16.) Petitioner submitted monthly DMRs throughout 2005 and 2006 that revealed numerous discharges in excess of these limitations. *Id.*

As a result, on February 8, 2006, DEP issued a notice of violation to Petitioner. (Finding of Fact No. 21.) On April 4, 2006, DEP and representatives of Petitioner participated in an enforcement conference to discuss the effluent violations and the standard operating procedures at the sewage treatment plant; DEP advised Petitioner that the violations resulted from the fact that a certified operator was not visiting the plant frequently enough. (Findings of Fact Nos. 22–23.) On October 27, 2006, DEP issued a second notice of violation to Petitioner. (Finding of Fact No. 25.) On January 29, 2008, DEP forwarded a proposed consent assessment of civil penalty in the amount of $6,000.00 to Petitioner, but Petitioner rejected the same. (R.R. at 146a, 171a.) Ultimately, by notice of final assessment dated August 1, 2008, DEP imposed a civil penalty against Petitioner in the amount of $11,689.00. (Finding of Fact No. 26.)

The Board issued these relevant findings:

37. [DEP] calculated the following penalties for the monthly-average violations:

| Month/Parameter | Permit Limit | DMR Reported | Penalty $ |
| --- | --- | --- | --- |
| 5/05 / TSS | 10 | 16.3 | $1,000 |
| 5/05 / NO2 + NO3 | 10 | 12.28 | $1,000 |
| 6/05 / CBOD5 | 10 | 10.8 | $1,000 |
| 7/05 / NO2 + NO3 | 10 | 47.04 | $1,163 |
| 9/05 / NO2 + NO3 | 10 | 41.96 | $1,125 |
| 10/05 / NO2 + NO3 | 10 | 15.37 | $1,000 |
| 11/05 FC | 2000 | 3955 | $1,000 |
| 1/06 NH3–N | 9 | 10.1 | $1,000 |
| 1/06 NO2 + NO3 | 10 | 12.59 | $1,000 |
| 7/07 NH3–N | 3 | 5.2 | $1,000 |
| 12/07 NH3–N | 9 | 13.1 | $1,000 |
| | | **Monthly total:** | $11,289 |

(C. Ex. 31.)

38. In all but two instances, [DEP] assessed the minimum $1,000 monthly penalty specified in [DEP's] guidance matrix.[2] (C. Ex. 31; T. 76.)

39. The two instances where the violations exceeded $1,000 were for total ni-

However, the Board later reduced the penalty by $100.00.

2. Section 605(a) of The Clean Streams Law, Act of June 22, 1937, P.L. 1987, *as amended,* 35 P.S. § 691.605(a), authorizes a maximum penalty of $10,000.00 per day for each violation.

trogen exceedances reported in the DMRs for July and September 2005 that were in excess of four times the permit limit. (C. Ex. 20, 21, 31; T. 76.)

40. [DEP] also assessed the minimum $100 penalty under [DEP's] guidance matrix for the following daily violations:

| Date/Parameter | Permit Limit | DMR Reported | Penalty $ |
| --- | --- | --- | --- |
| 9/13/05 / NO2 + NO3 | 10 | 40.41 | $100 |
| 7/06 / FC | 1000 | 20000 | $100 |
| 7/07 / FC | 1000 | 2400 | $100 |
| | | **Monthly total:** | $300 |

(C. Ex. 31; T. 77.) (Findings of Fact Nos. 37–40.) Additionally, DEP assessed a $100.00 penalty for Petitioner's December 2005 DMR that was reportedly received two days late. (Finding of Fact No. 41.) Petitioner thereafter appealed to the Board.

At a hearing before the Board, DEP presented the testimony of Stephen Brokenshire, a compliance specialist in the Northeast Region Water Management Program who calculated the penalty assessed against Petitioner. (Finding of Fact No. 28.) Brokenshire explained that he calculated the penalty using DEP's guidance document "Civil Penalty Calculations for Effluent Violations" and an associated Microsoft Excel computer program (the matrix), which specified a minimum penalty of $1,000.00 for monthly violations, $250.00 for weekly violations, and $100.00 for daily violations.[3] (Findings of Fact Nos. 29–30.) Brokenshire stated that he also considered the willfulness of the violation, any damage to the receiving source, and the volume of the discharge. (Finding of Fact No. 31.) Brokenshire said that in computing the penalty, he described the violations as negligent rather than accidental due to their recurring nature associated with the lack of adequate plant supervision. (Finding of Fact No. 32.) Brokenshire noted that the matrix provides a factor based on the stream class, that Lizard Creek was classified as "Trout Stocked," and that he characterized the damage to the unnamed tributary and Lizard Creek as "low." (Findings of Fact Nos. 34, 35.)

Brokenshire assessed the minimum $1,000.00 penalty for nine monthly violations; increased penalties of $1,163.00 and $1,125.00 for months in which the effluent violations exceeded four times the permitted limits; the minimum $100.00 penalty for each of three daily violations; and a penalty of $100.00 for a late DMR.[4] (Findings of Fact Nos. 37–41.)

The Board concluded that the evidence of record was insufficient to support a

3. The guidance document explains that the penalty formula under the matrix initially assigns the statutory maximum penalty and then reduces that amount after factoring in the willfulness and magnitude of the violation, which are represented by percentages entered by DEP personnel. (R.R. at 189a.) Willfulness includes consideration of the cause of the violation, the violator's compliance history, and other permit or regulatory requirements. (R.R. at 190a.) Magnitude includes consideration of the damage to the receiving stream, stream classification, the size of the facility, and the degree to which the discharge exceeded permit limits. (R.R. at 190a–91a.) The guidance document notes that every discharge by a treatment facility has an impact on receiving waters and sets forth the minimum penalties described above. (R.R. at 189a, 191a.)

4. While the total penalties equal $11,688.00, and not $11,689.00 as imposed by DEP, Petitioner does not challenge the latter figure.

finding that the DMR in question was untimely. However, the Board concluded that the remaining penalty assessments were lawful and reasonable. (Finding of Fact No. 43.) Hence, the Board reduced the civil penalty imposed by DEP to $11,589.00.

On appeal to this Court,[5] Petitioner argues that penalties assessed by the Board do not reasonably fit the violations, as the record lacks evidence of harm to the receiving stream, evidence of a sufficient deterrent effect, and evidence that a monthly average violation warrants a higher penalty amount than a daily violation. According to Petitioner, a nominal penalty of $100.00 per violation would be reasonable. We disagree.

Section 605(a) of The Clean Streams Law authorizes the assessment of civil penalties, providing, in pertinent part, as follows:

In addition to proceeding under any other remedy available at law or in equity for a violation of a provision of this act, rule, regulation, order of the department, or a condition of any permit issued pursuant to this act, the department, after hearing, may assess a civil penalty upon a person or municipality for such violation. Such a penalty may be assessed whether or not the violation was wilful. The civil penalty so assessed shall not exceed ten thousand dollars ($10,000) per day for each violation. In determining the amount of the civil penalty the department shall consider the wilfullness of the violation, damage or injury to the waters of the Common-

wealth or their uses, cost of restoration, and other relevant factors . . . .

35 P.S. § 691.605(a). The deterrent effect of a penalty is one of the "other relevant factors" which may be considered when assessing a penalty under this section. *Leeward Construction, Inc. v. Department of Environmental Protection*, 821 A.2d 145 (Pa.Cmwlth.), *appeal denied*, 573 Pa. 706, 827 A.2d 431 (2003).

DEP has the burden of proving the propriety of its assessment of a civil penalty by a preponderance of the evidence. *Department of Environmental Protection v. Bethenergy Mines, Inc.*, 563 Pa. 170, 758 A.2d 1168 (2000). Further, in reviewing the Board's penalty assessments, this Court may not substitute its judgment for that of the Board, and the Board's decision must be upheld provided that the penalties reasonably fit the violations. *Leeward Construction.* A penalty would not reasonably fit a violation where it "would strike at one's conscience as being unreasonable. . . ." *United States Steel Corporation v. Department of Environmental Resources*, 7 Pa.Cmwlth. 429, 300 A.2d 508, 514 (1973).

In *Leeward Construction*, Leeward Construction, Inc. (Leeward) was hired as an earthmoving subcontractor at a construction site for a new Wal–Mart in Wayne County, Pennsylvania. DEP issued Wal–Mart a NPDES permit authorizing the discharge of storm water from construction activities at the construction site as well as an adjacent site where waste materials were placed. The permit required Wal–Mart to implement a DEP-approved, site-specific erosion and sediment (E & S)

---

**5.** Our scope of review of the Board's order is limited to determining whether the findings of fact are supported by substantial evidence and whether the Board committed constitutional violations or errors of law. *Eureka Stone Quarry, Inc. v. Department of Environ-* *mental Protection*, 957 A.2d 337 (Pa.Cmwlth. 2008). The resolution of conflicts in testimony, the credibility of witnesses, and the weight given the evidence are within the province of the Board. *Id.*

control plan. Leeward joined as a co-permittee under Wal–Mart's NPDES permit. DEP conducted several inspections at the sites and found numerous violations, including the failure to install or maintain E & S control facilities, which resulted in the discharge of sediment-laden water into protected waters of the Commonwealth. DEP ultimately issued two stop work orders to Leeward, but Leeward did not abide by these orders. DEP filed a complaint with the Board requesting an assessment of civil penalties. The Board imposed a total civil penalty of $258,500.00 against Leeward finding that Leeward had chronically failed to install and maintain effective E & S control facilities, operated without an approved E & S control plan, discharged sediment pollution into protected waters, and deliberately violated the stop work orders. On appeal, this Court rejected Leeward's arguments that the penalties were unreasonable in relation to its conduct and that its conduct was merely negligent, as opposed to reckless or intentional as found by the Board. Further, we noted that deterrence may be a factor in assessing a civil penalty based on a proper factual foundation.

In *United States Steel Corporation,* the Department of Environmental Resources (DER) found that United States Steel Corporation (U.S. Steel) had discharged great quantities of oils, constituting industrial waste, into the Monongahela River in violation of The Clean Streams Law. U.S. Steel challenged DER's finding before the Board. The Board, concluding that DER presented sufficient evidence in support of this finding, issued an adjudication assessing a civil penalty against U.S. Steel in the amount of $2,000.00. The next day, the Board issued a corrected adjudication amending the civil penalty to $5,000.00 without providing any explanation for the increase. On appeal, this Court remanded the matter to the Board with the direction that the Board reinstate the original $2,000.00 penalty, concluding that the imposition of an increased civil penalty of $5,000.00 without any explanation on the record or any opportunity for U.S. Steel to challenge that figure would strike at one's conscience as being unreasonable and would not fit the statutory violation.

■ Petitioner first argues that the penalty is excessive because the record lacks evidence of harm to the receiving stream. In making this argument, Petitioner stresses the absence of any testimony concerning observations of damage to the receiving stream or analytical sampling. Petitioner notes that the guidance document cited by Brokenshire considers damage to the receiving stream and requires that "[DEP] personnel determine damage by observation and analytical sampling." (R.R. at 190a.) However, Petitioner's argument neglects the fact that it performed its own analytical sampling and self-reported the effluent violations in its monthly DMRs. The guidance document specifically indicates that the DMRs as well as sampling results from DEP inspections are the primary sources of data for the matrix calculations. (R.R. at 189a.)

Petitioner relies on this Court's previous decisions in *Westinghouse Electric Corporation v. Department of Environmental Protection,* 705 A.2d 1349 (Pa.Cmwlth.), *appeal denied,* 556 Pa. 717, 729 A.2d 1133 (1998) (*Westinghouse I* ) and *Westinghouse Electric Corporation v. Department of Environmental Protection,* 745 A.2d 1277 (Pa. Cmwlth.2000) (*Westinghouse II* ), as well as the Board's previous decision in *Department of Environmental Resources v. Koppers Company, Inc.,* 1977 E.H.B. 55, in support of its argument. However, Petitioner's reliance is misplaced. In the Court's view, these decisions actually lend

support to the penalties imposed in the present matter.

*Westinghouse I* and *Westinghouse II* are based on the same underlying facts. Westinghouse Electric Corporation (Westinghouse) operated an elevator manufacturing plant near Gettysburg, Pennsylvania from 1969 to 1989. Westinghouse routinely used trichloroethylene and trichloroethane as degreasers in various operations at the plant. In 1988, the Department of Environmental Resources filed a complaint seeking assessment of civil penalties against Westinghouse resulting from the release of trichloroethylene and trichloroethane into the soil and surrounding waters over a period of approximately seven years. DEP noted the presence of these chemicals in a water sample collected near the plant's storm sewer discharge point, as well as in sixty nearby residential wells.

In *Westinghouse I,* the Board concluded that the evidence of record established Westinghouse's continual leakages of trichloroethylene and trichloroethane, but only two instances of the actual entry of the degreasers into the groundwater. The Board thereafter assessed a civil penalty against Westinghouse totaling $5,451,283.00. However, in contemplating the degree of harm under its penalty analysis, the Board considered that all of the contaminated wells in the area resulted from Westinghouse's illegal discharges, a fact not found by the Board. This Court concluded that the Board could not base its penalty calculation on matters not found to be proven, and we remanded to the Board for a new penalty calculation.

On remand, the Board in *Westinghouse II* reduced the civil penalty assessed against Westinghouse to $3,296,515.00. Citing the number, seriousness, and duration of the violations in the case, this Court concluded that the amount of the penalty

reasonably fit the sheer scale of Westinghouse's violations. We specifically rejected an argument by Westinghouse that a severe penalty is only warranted where intentional or reckless conduct is established.

In *Koppers Company,* the Board concluded that, even in the absence of proof of injury to the waters of the Commonwealth, the imposition of a "nominal" civil penalty in the amount of $1,000.00 was appropriate and reasonable. In that case, the Board noted that the record failed to reveal the extent of the damage to the waters of the Commonwealth resulting from the discharge of industrial waste by Koppers Company, Inc. Nevertheless, the Board concluded that it could presume that a discharge in excess of environmental quality board regulations resulted in damage to such waters, thereby justifying a "nominal" civil penalty of $1,000.00. Further, the Board in *Koppers Company* indicated that it would have imposed a greater penalty had the Department established substantial harm to the waterways in question.

In the present case, Petitioner self-reported numerous effluent violations in its monthly DMRs over a period of two and a half years. Brokenshire testified that the violations resulted from Petitioner's negligence in the nature of a lack of adequate plant supervision. Additionally, Brokenshire testified in the present case that the receiving stream is classified by DEP biologists as a trout stock fishery. (R.R. at 138a–39a.) As noted above, stream classification is one of the many factors considered under the matrix. Petitioner's NPDES permit includes a special condition directing Petitioner's attention to the fact that the receiving stream is a "seasonally dry stream" and that the effluent discharges would be "intermittently without the benefit of dilution." (R.R. at 207a.) In

its adjudication, the Board recognized that this condition requires Petitioner to exercise care in meeting the effluent limits. (Board op. at 13.) However, the evidence of record reveals that, for half of 2005, Petitioner exceeded the monthly effluent limits for various discharges. (Finding of Fact No. 37.) As the Board noted in its adjudication, "[r]epeated discharges of excess fecal coliforms, total suspended solids, ammonia, nitrogen, and biochemical oxygen demand cannot be considered harmless." [6] (Board op. at 13.) Thus, we cannot agree with Petitioner that the record lacks evidence of harm to the receiving stream.

■ Next, Petitioner questions the Board's statement that "anything less than the amounts that were assessed by [DEP] for monthly-average violations would not have the necessary general or specific deterrent effect." (Board op. at 12.) Specifically, Petitioner asserts that a lesser amount would have a sufficient deterrent effect and that the Board failed to explain what conduct the civil penalty was designed to deter. Petitioner's argument lacks merit. The Board rejected a contention by Petitioner that all of the violations were accidental and resulted from unforeseen malfunctions or breakage of treat-

ment components, noting that Petitioner failed to credibly connect specific malfunctions to specific exceedances. Instead, Patrick Musinski, a water quality specialist supervisor with DEP, testified before the Board that the violations resulted from the fact that a certified plant operator only visited the site weekly. (R.R. at 127a.) Brokenshire offered identical testimony, and he characterized Petitioner's oversight in this regard as negligent. (R.R. at 134a, 138a, 145a.) The Board specifically referenced this testimony when discussing the issue of deterrence in its opinion.[7] Moreover, the Board, in its adjudication, set forth the basis for each of the penalties imposed and stressed the continuing nature of the violations, including eleven monthly-average violations and three daily-maximum violations over a relatively short period of time. (Board op. at 11–13.) These repeated violations are what the Board sought to deter. (Board op. at 12.)

■ Finally, Petitioner argues that the penalty assessed does not reasonably fit the violations because there is no evidence that a monthly average violation warrants a higher penalty than a daily violation.[8] Again, Petitioner's argument lacks merit. At the Board hearing, DEP submitted into evidence, without objection,

6. We note that The Clean Streams Law twice declares the discharge of sewage into the waters of the Commonwealth to be a nuisance. Section 3 of The Clean Streams Law states that "[t]he discharge of sewage ... into the waters of this Commonwealth, which causes or contributes to pollution as herein defined or creates a danger of such pollution is hereby declared not to be a reasonable or natural use of such waters, to be against public policy and to be a public nuisance." 35 P.S. § 691.3. Section 202 provides, in pertinent part, that "[a] discharge of sewage ... contrary to the terms and conditions of a permit or contrary to the rules and regulations of the department is hereby declared to be a nuisance." 35 P.S. § 691.202.

7. We note that both Musinski and Brokenshire also testified that the violations substantially decreased and/or ceased after the certified plant operator increased the frequency of his visitation to the site to four to five times per week. (R.R. at 127a, 148a.)

8. In the course of this argument, Petitioner, citing June of 2005 in particular, asserts that DEP cannot impose a penalty for a monthly-average violation and a daily-maximum violation in the same month. However, the violations in June of 2005 related to different effluent limitations, the monthly-average violation representing carbonaceous biochemical demand and the daily-maximum violation representing total nitrogen.

the water management program guidance document explaining how the civil penalties are calculated using the matrix. The guidance document noted the minimum penalty for monthly, weekly, and daily violations. Brokenshire explained that the minimums are established based upon the monitoring frequency of the parameters contained in Petitioner's permit. (R.R. at 137a.) The Board recognized the significance of the length of the reporting period, stating that "it must be remembered that [Petitioner's] exceedances that resulted in penalties of $1,000 represent violations of *monthly* limits. And, of course, there were eleven of them." (Board op. at 13) (emphasis in original). Further, the Board characterized the assessed penalties as "extremely low" given Petitioner's admitted violations of its NPDES permit limits. *Id.* Moreover, as DEP notes in its brief to this Court, common sense dictates that the discharge of pollutants over a longer period of time warrants a higher penalty.

Because the record supports the Board's findings and conclusions, we conclude that the penalties assessed by the Board reasonably fit Petitioner's established violations and do not strike at one's conscience as being unreasonable. Accordingly, the order of the Board is affirmed.

### ORDER

AND NOW, this 18th day of March, 2011, the May 14, 2010, order of the Environmental Hearing Board is hereby affirmed.